UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 16-10174-GAO

UNITED STATES OF AMERICA,

v.

CHRISTOPHER SAEMISCH,
Defendant.

OPINION AND ORDER
March 1, 2019

O'TOOLE, D.J.

The defendant, Christopher Saemisch, is charged by indictment with one count of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2). He has moved to suppress evidence seized as a result of his arrest, contending that suppression is required because Homeland Security agents located him by using real-time cell site location information ("CSLI") for which no court order or warrant had been issued. He also moves to suppress evidence seized pursuant to a search warrant executed on his residence because it is fruit of the unlawful CSLI tracking and because his post-arrest transport constituted an unnecessary delay in his being brought before a judicial officer in violation of Rule 5 of the Federal Rules of Criminal Procedure.

**I.     Factual Background**

The investigation that led to the defendant's indictment began in early April 2016 when an acquaintance of the defendant who was an inmate at FMC Devens (the cooperating witness, or "CW") contacted federal agents to inform them that the defendant had discussed his viewing, sharing, and storing of child pornography by telephone and email with the CW. The CW also said that the defendant had expressed a desire to travel to Europe to engage in sexual relationships with

children. During his communications with the CW, the defendant frequently discussed his access to and involvement with specific children, including a five-year-old girl ("Minor-1") and a nine-year old girl ("Minor-2"),[1] at a nudist camp and other places. For example, in one email dated April 27, 2016, the defendant wrote:

> Skyler[2] feels he's a friend of mine who went to a pagan camp that is clothing optional this weekend he left on Friday ended up staying with some people Saturday night and he slept in a tent with [Minor-1] the 5 year old and he slept with [Minor-1] the next several nights. . . . [H]e's going back to the house probably give [Minor-1] a bath here real soon it was fun giving her a shower at the camp after she rolled around in a mud puddle but naked . . . it must have taken an hour in the shower for [Minor-1] and Skyler to get clean. he had to work real hard to make sure she was clean everywhere then he had to clean the shower floor."[3]

(U.S.' Resp. in Opp'n to Def.'s Mot. to Suppress Evid. ("Gov't Opp'n"), Ex. A (dkt. no. 110).)[4]

The next day, he sent another email to the CW describing how he (as "Skylar") had spent the night at Minor-1's house:

> He slept in [Minor-1's] room. They stayed up and watched super hero six, snuggling together. Then her medication kicks in and she is out like a log. At that point, nothing will wake her. Skylar called me and said he was tired today, but happy.

(Id., Ex. C (dkt. no. 110-2).) He went on to say:

> Like [Minor-1] naked in the mud puddle, dad told Skylar "lets not tell mom." [Minor-1] was quick to remind Skylar from then on "shhhhh. Don't tell mom...."
>
> . . . .

---

[1] Agents contacted Minor-2's mother to warn her about possible abuse by the defendant and the mother confirmed that her children had unsupervised sleepovers with an individual named "Chris" who matched the defendant's description at a location that matched the general vicinity of the defendant's residence. (Gov't's Opp'n Ex. B (dkt. no. 110-1).)

[2] In email communications with the CW, the defendant appears to have referred to himself in coded language as "Skylar" or "Skyler."

[3] Quoted excerpts from the communications are reproduced as they appear in the parties' submissions. Errors in spelling, punctuation, or otherwise have not been corrected or noted.

[4] This and several other filings were submitted under seal. As no substantial interests are adversely affected by the limited quotation from those materials in this order, the seal is lifted for the purposes of this Opinion and Order.

> They want Skylar to baby sit for 5 days over Memorial Day weekend . . . . He will be at the pagen festival with [Minor-1] while the parents work long hours at the festival. Like last weekend, [Minor-1] and Skylar will share a tent together for the whole festival.

(Id.) A day later, on April 29, he elaborated on Minor-1's medication and reiterated his plan to sleep in the same tent with her:

> As far as medications go I'm now so part of the routine that when I am there I administer the medications.they're trying to go natural so along with a pill and a chewable pill that she takes she also takes this natural mix of frankincense and myrrh and it's called passionflower so mom's warned me that she'll get real passionate after she takes it, really huggy and wants to cuddle and touch and kiss. And I have found that to be so, she takes passionflower right before bed. but she loves to cuddle and kiss all the time anyway ! So I don't notice too big of a difference . So in summary you could say she takes medications that make her very passionate before bed and then knocks her out completely ...........
>
> I may offer to set up my tent or if it's easier ,because it's going to be so crowded, we could either set up [Minor-1's] tent or mine but there's really no sense setting up both of them. ....

(Id., Ex. D (dkt. no. 110-3).)

On May 3, 2016, agents conducted an undercover operation during which the defendant allegedly sent several emails containing child pornography to an email account created and controlled by federal agents under the belief that the CW was the recipient. The CW and the defendant also communicated via a video chat that was available to the agents.

On Thursday, May 5, 2016, a magistrate judge authorized a criminal complaint charging the defendant with one count of distribution of child pornography and issued an arrest warrant for the defendant. That afternoon, the defendant told the CW in response to a question about his weekend plans:

> I'm gonna be camping. Uh. I just spent last evening with [Minor-2], I gotta tell you one thing real funny she said, she said, talking about swimming she goes 'well I don't need floaties, I don't need a life vest, I don't need a swimsuit.'

(Id., Ex. G at 3:44 (dkt. no. 110-6).)

3

At approximately 6:00 a.m. the next day, Friday, May 6, 2016, agents arrived at the defendant's home in Kansas City to arrest him pursuant to the warrant, but he was not there. Agents contacted AT&T, his cell service provider, and requested location information for the defendant on an exigent basis pursuant to a provision of the Stored Communications Act ("SCA") which permits a provider to divulge certain information about a subscriber to a governmental entity if the provider "in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay." See 18 U.S.C. § 2702(c)(4). An agent informed AT&T that law enforcement agents "had an arrest warrant for a subject who was charged with distribution of child pornography and during the investigation the subject had admitted to harming young children as recent as the previous weekend." (Mot. to Suppress Evid. & Req. for Hr'g ("Def.'s Mot."), Ex. A (dkt. no. 105-1).) The agent stated that agents were in the process of obtaining a search warrant. In response to a question from the AT&T representative, the agent reiterated that she had reason to believe that children were in danger of molestation by the defendant either presently or in the very near future. "Based on the information provided, AT&T determined there was an imminent threat to young children who were being abused by the subject." (Id.) Accordingly, AT&T agreed to use a program called "Mobile Locate" to obtain real-time CSLI for the defendant's phone. The program was activated at 10:26 a.m. on May 6, and permitted location alerts giving the latitude and longitude of the phone to be sent to an ICE agent every fifteen minutes.

At approximately 11:50 a.m., using the CSLI provided by AT&T, agents located the defendant in a tent at the Gaea Retreat Center in Leavenworth, Kansas, and arrested him. The defendant stated that he wanted his cell phone, among other things, to be taken from his belongings so he could have it with him. The agents did not examine the contents of the cell phone but did

remove its outer casing to access the cell phone's unique International Mobile Equipment Identity ("IMEI") number imprinted on a tag under the casing. The contents of the cell phone were later searched pursuant to a warrant.

Agents placed the defendant in their government vehicle. They asked the defendant if he wanted his own vehicle towed or driven back to his house. The defendant requested it be taken to his house. He also requested that a cooler with meat be taken so that it would not spoil. Agents further asked him to choose whether he wanted to be interviewed by agents at his home or at a courthouse or Marshals office; the defendant said it was "fine" to be interviewed at his residence.[5]

During the somewhat lengthy trip to his residence, the defendant stated he needed to use the bathroom, but also said he could wait until he got home. The agents told the defendant that when they arrived at his house they would need to do a protective sweep before the defendant could enter. The defendant assented to that plan.[6]

At about 1:00 p.m., the agents and defendant arrived at the defendant's house. The home was swept by agents and the bathroom in particular was searched for potentially dangerous items before the defendant was permitted to use it. Thereafter, agents attempted to question the defendant

---

[5] Agent: "It's up to you, but I'd assume, the case agent would assume to talk to you at your house if that's alright with you otherwise we'd have to go to either the courthouse or the Marshals to talk to you and it's not as comfortable." Defendant: "No that's fine." (Gov't Opp'n, Ex. I at 18:21 (dkt. no. 111).)

[6] Agent: "So my understanding that if its good with you Chris, we're gonna go clear your house, make sure no one else is in there, make sure there's no bombs or guns or anything in the bathroom, let you use the bathroom, and then . . . ." Defendant: "Yeah, I need to go." Agent: "Yeah, okay, we'll make it fast, but if that's ok with you, then that's the plan we'll go with. So you're good with us going in and making sure no one else is in your house? Yes or no? . . . I said are you good with us going in, making sure no one's in your house, no one's in your bathroom and then getting you in there?" Defendant: "Well, I guess you have to, don't you?" Agent: "I mean we don't have to. We can try to find a QuikTrip or something, I just, I just want to do what's good for you." Defendant: "Alright." Agent: "You're good with it?" Defendant: "Yeah." Agent: "Alright. Alright. We'll get you in there and then we'll get you sat down so you can talk to the case agent. She can answer your questions." (Id. at 54:59.)

in his living room, but he did not make a statement. He was subsequently transported to a courthouse for his initial appearance, which took place at 3:11 p.m. Approximately three-and-one-half hours had elapsed between the time the defendant was arrested at the campground and the time he was presented before the magistrate judge.

Later that day, a magistrate judge authorized a warrant to search the defendant's home. The affidavit in support of the application included observations agents had made regarding the interior of the home. The affiant noted in particular that various features of the home matched items in the background of the video chat that had occurred between the defendant and CW.

## II.    Defendant's Motion to Suppress

### A.    Real-Time CSLI

The defendant argues first that the government's acquisition of real-time CSLI violated the Fourth Amendment because the acquisition was accomplished by means of a warrantless search.

After the parties' initial briefs were submitted, the Supreme Court issued its decision in Carpenter v. United States, 138 S. Ct. 2206 (2018). In that case, prosecutors were granted court orders under the SCA, see 18 U.S.C. § 2703(d), to obtain from wireless carriers almost 13,000 location points cataloging the defendant's past movements over 127 days. Carpenter, 138 S.Ct. at 2213. The Supreme Court concluded that the acquisition of the historical CSLI implicated the defendant's "legitimate expectation of privacy in the record of his physical movements" and therefore was a search for which the government must generally obtain a warrant supported by probable cause. Id. at 2217, 2221.

Carpenter does not provide an answer to the question whether the brief collection of real-time (as distinguished from historical) CSLI for an individual already subject to an arrest warrant

6

implicates the Fourth Amendment.[7] The Court acknowledged that its holding was a "narrow one" and explicitly reserved "express[ing] a view on matters" such as "real-time CSLI." Id. at 2220. Additionally, the Court indicated that certain case-specific exceptions may support a warrantless search of cell-site records under certain circumstances, including when the "exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Id. at 2222–23 (alteration in original) (quoting Kentucky v. King, 563 U.S. 452, 460 (2011) (internal quotation marks omitted). "Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." Id. at 2223. "As a result, if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI." Id.

This is one such circumstance. The government's warrantless acquisition of the defendant's real-time CSLI was reasonable because there were exigent circumstances that supported an objectively reasonable belief that the defendant posed a potentially imminent threat to the safety of identified minor children. In his communications with the CW, the defendant had discussed in coded terms what could reasonably be understood as his prior sexual molestation of children. In particular, he had described some of his past encounters with the children as having occurred during "camping," and he had disclosed that he was planning to be "camping" with one of the minors during the upcoming weekend. After a magistrate judge had issued a warrant for his

---

[7] See id. at 2216 ("The question we confront today is how to apply the Fourth Amendment to a new phenomenon: the ability to chronicle a person's *past movements* through the record of his cell phone signals." (emphasis added).); see also id. at 2218 (describing the "retrospective quality of the data" that "gives police access to a category of information otherwise unknowable" because it permits the government to "travel back in time to retrace a person's whereabouts" without even knowing "in advance whether they want to follow a particular individual, or when").

7

arrest for distribution of child pornography, agents had attempted to execute the warrant by going to the defendant's home. He was not there, and the agents did not know where he was.

The agents could not obtain the CSLI data themselves. They had to ask a third party, AT&T, the defendant's cell service provider, to make the information available. A provider may do so if it believes there is an "emergency involving danger of . . . serious physical injury" that requires "disclosure without delay" of such information. 18 U.S.C. § 2702(c)(4). AT&T representatives considered the information presented by agents and apparently concluded that the condition set forth in the statute was satisfied. There can be no doubt that sexual molestation of a child can constitute "serious physical injury." The "emergency" presented was that the defendant had bragged to the CW about his abuse of children and expressed what could reasonably be understood as an apparent intention to repeat that abuse. "Disclosure without delay" of real-time CSLI that could lead agents to the defendant was justified under the kind of "exigent circumstances" hypothesized by the Court in Carpenter. See 138 S.Ct. at 2222–23.

B. Seizure and Search of Electronics in Tent

The defendant next argues that evidence from the cell phone collected from his bag at the time of his arrest must be suppressed because its seizure and search were not justified as incident to his arrest.

As to the seizure, I agree with the defendant that the seizure itself is not justified as simply incident to arrest because the cell phone was not on his person and was not in the area within his immediate control. However, the seizure was essentially voluntarily agreed to because the defendant specifically requested the cell phone be removed from the tent and brought with him.[8]

---

[8] To the extent the defendant is arguing that it was permissible only for the officers to seize the cell phone for the limited purpose of transporting it back to his house, the cell phone and evidence

Even if the arresting officers had not inventoried the contents of the bag at the campsite, it likely would have been done at the Marshal's office or courthouse when the defendant was transported there subsequent to his lawful arrest.

As to the search of the cell phone, the digital contents and data were not searched until after the government obtained a warrant to do so. Agents did open the outer casing of the cell phone in order to obtain its IMEI number, but as I have previously found, the removal of the back of a cell phone casing to obtain an identifying number does not amount to a search under the Fourth Amendment because a defendant does not have a reasonable expectation of privacy in the serial number associated with his cell phone. See United States v. Green, No. 09-10183-GAO, 2011 WL 86681, at *3 (D. Mass. Jan. 11, 2011) (finding no reasonable expectation of privacy in an IMEI number).

### C.     Evidence Seized Pursuant to Search of Residence

On the day of the defendant's arrest, a magistrate judge issued a warrant to search his residence. In the affidavit submitted in support of the warrant, the affiant reported that she had been in the residence after the defendant's arrest and that she "recognized several items inside the living room matched items in the background" of the video chat between the defendant and the CW recorded earlier. (Def.'s Mot., Ex. C at 30–32 (dkt. no. 105-3).) She went on to describe the similarities. The defendant contends that the details about the similarities should be excised from the warrant application because they were derivative of the illegally obtained real-time CSLI and of an unnecessary delay in his post-arrest transport, and without that information, the warrant application does not support a finding of probable cause.

---

derived from it would have been inevitably discovered because agents ultimately searched the residence pursuant to a warrant.

The defendant's argument that the information should be excised as the fruit of the agents' having obtained real-time CSLI is rejected in light of the conclusion explained above; there was no "poisonous tree."

The defendant's contention that the three-and-one-half hours that elapsed between his arrest and his presentment constituted an unnecessary delay is likewise rejected. Rule 5 requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer." Fed. R. Crim. P. 5(a)(1)(A). "The right of speedy presentment not only checks the likelihood of coercive questioning, but also avoids 'all the evil implications of secret interrogation of persons accused of crime.'" United States v. Jacques, 744 F.3d 804, 813 (1st Cir. 2014) (quoting Corley v. United States, 556 U.S. 303, 307 (2009)). However, the "right of prompt presentment does not create a 'mechanical or automatic' duty for officers to arraign defendants upon arrest." Id. at 814 (quoting Mallory v. United States, 354 U.S. 449, 455 (1957)). Rather, "[c]ircumstances may justify a brief delay" where that delay is based on reasonable or legitimate grounds. Id. (quoting Mallory, 354 U.S. at 455).

Here, the defendant consented to being taken to his residence. See United States v. Iribe, 11 F.3d 1553, 1556–58 (10th Cir. 1993) (finding that "[e]ven assuming that an unnecessary delay occurred" when an arrestee was taken forty blocks to his house, "the record [did] not reveal that the evidence seized from the house was the result of any illegal activity on the part of the officers" because they obtained consent to search from resident). When asked by the arresting agents, the defendant specified that he wanted certain possessions taken to his house after his arrest, including his vehicle and his cooler. The agents notified him that they were driving him to his house and, at least once, provided him with the option of going to the courthouse or Marshal's office instead,

stating that it was "up to" the defendant to decide. (Gov't' Opp'n Ex. I at 18:21.) The defendant stated that it was "fine" to go to his house. (Id. at 18:34.)

As a result, the excision of the details about the similarities between the location captured during the video chat and the defendant's residence is not justified.[9]

### III. Conclusion

For the foregoing reasons, the defendant's motion to suppress (dkt. no. 105) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.<br>
United States District Judge

---

[9] Even if the details were excised, the warrant would still support a finding of probable cause for the reasons substantially articulated by the government in its opposition.

11